IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                                          PLAINTIFF/RESPONDENT

v.                                      Civil No. 05-5031
                                        Crim. No. 03-50057-001
WALTER W. FISCHER                                                 DEFENDANT/MOVANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Movant Walter Fischer brings this motion under 28 U.S.C. § 2255 to vacate, set aside, or correct sentence. Fisher claims that his plea was involuntary and unknowingly entered and his defense attorney Jim Rose III failed to file a notice of appeal after being directed to do so or to discuss the matter of appeal with him.

A hearing was conducted on November 15, 2005. Witnesses were Fisher, his wife and son Pamela Fischer and Damien Fischer, defense attorneys Jim Rose III and Rick Woods, and Rafael Marquez, interpreter/investigator with the Federal Public Defender's Office. A transcript of the hearing was filed on December 14, 2005. The parties filed post-hearing briefs. (Docs. 57, 58, 59 Atts. "A," "B," "C").

DISCUSSION

On May 10, 2004, Fisher pled guilty pursuant to a plea agreement (Govt's Ex. 2) to 16 counts of a 63-count indictment charging him with aiding and assisting in the preparation of false income tax returns in violation of 26 U.S.C. § 7206(2). He was represented by Jim Rose III, lead counsel, and Rick Woods.

The plea agreement precluded Fisher from withdrawing or appealing his plea or contesting it in a post-conviction proceeding under 28 U.S.C. § 2255. The maximum penalties were stated as three years and/or a $100,000 fine on each count plus restitution for the full loss caused by the conduct. The agreement provided that the federal sentencing guidelines would apply and "relevant conduct" for which Fisher had not been charged or convicted could be considered in sentencing. The government agreed not to oppose a decrease in the offense level for acceptance of responsibility, to recommend a sentence at the bottom of the appropriate guideline range, to stipulate that the loss did not exceed $400,000 for purposes of calculating the base offense level, and to dismiss the remaining counts after sentencing. The parties stipulated that the agreement was not binding on the court.

At the plea hearing, Hon. Jimm Larry Hendren advised Fischer of the maximum penalties of three years in prison and a $100,000 fine on each of the 16 counts and the matters of restitution and supervised release. Fischer advised Judge Hendren that he understood the maximum penalties that applied, had read and fully discussed the plea agreement with his attorneys before signing it and felt like he understood it, had not been promised a punishment less than the law called for, had talked about sentencing guidelines with his attorneys but knew that it was up to the judge to determine the guideline range and that it would be erroneous for anyone to promise him a certain sentence, understood the court could order restitution with regard to the other counts to which he was not pleading guilty, and understood he was waiving the right to appeal his plea and conviction and to contest it in a post-conviction proceeding.

After Assistant United States Attorney David Blackorby set out a factual basis for the plea, Judge Hendren accepted the plea, finding it knowing and voluntary. Judge Hendren ordered a presentence investigation report and allowed Fischer to remain free on bond.

On July 27, 2004, the presentence investigation (PSI) report (Govt's Ex. 1) issued. The report calculated the total loss to the IRS as $541,450.00, the amount paid out in refunds based on fraudulent deductions. The base offense level was 20 for a tax loss of more than $400,000 and less than $1,000,000 under § 2T1.4. Two points were added under § 2T1.4(b) because Fischer was in the business of preparing tax returns. Three points were added pursuant to § 3A1.2(a) because the victims were government officers or employees and the offenses of conviction were motivated by such status. Two points were subtracted for acceptance of responsibility under § 3E.1.1(a) for a total adjusted offense level of 23. With a criminal history category of I, the guideline range was 46 to 57 months. In objections to the report dated August 12, 2004, (Govt's Ex. 3), Fischer challenged the calculation of the total loss and imposition of the victim enhancement.

At the sentencing conducted on September 2, 2004 (see Sentencing T., Govt's Ex. 4), defense attorney Woods argued that the judge should consider the loss as less than $400,000, as set out in the plea agreement, with a resulting base offense level of 18 as opposed to 20. Woods acknowledged that the court did not have to adopt the parties' plea stipulations and he agreed that restitution in excess of $400,000 would be appropriate. Rose challenged the three-point victim enhancement, arguing that the only reason Fischer focused on tax returns for those in law enforcement was because of his 23 years in the field and his knowledge of specific deductions available to law enforcement officers. Rose contended that the intent of the enhancement was to prevent harm to government officers or employees while Fischer was trying to help put money in the victims' pockets.

Blackorby responded that after the plea agreement was executed, the IRS continued to identify clients of Fischer which resulted in the total tax loss exceeding $400,000. Blackorby conceded, however, that the government was bound by its stipulation to the loss being less than

-3-

$400,000. Regarding the enhancement for victim status, Blackorby maintained that Fischer's actual intent was to increase his practice, citing information in the PSI report that in 1997 Fischer did 63 returns while in 2002 he did over 400 returns with 88 percent of the returns being those of law enforcement individuals. Blackorby stated that because of the illegal deductions, the law enforcement employees have to pay back monies to the IRS with interest and penalties and have to endure the embarrassment and exposure of involvement in an illegal tax scheme.

Judge Hendren overruled Fischer's objections to the PSI report. The court found the amount of the actual loss to be $538,699 as stated in the report and pointed out that the plea agreement was not binding on the court. The court remarked that the agreement to cap the loss at $400,000 was somewhat "troubling" since the parties knew the court must arrive at the final correct loss amount. The court also observed that it knew the defendant felt he could rely on the agreement as to the amount of loss. (Sentencing T. at 39). The court nevertheless concluded that it had no evidence before it to show that the agreement was not made in good faith by the government based on the facts then known.

The court found the victim status enhancement was proper because the offenses of conviction were motivated by the status of the victims as government officers or employees. Judge Hendren relied on *United States v. Hildebrandt*, 961 F2d 116 (8th Cir. 1992), discussing the case in full. The judge explained that Hildebrandt, a farmer, prepared IRS form 1099s regarding law enforcement personnel, judges, lenders, attorneys, and others who had been involved with his foreclosure proceedings. The forms indicated that his losses were actually taxable gains to these persons. The victim status enhancement was applied to Hildebrandt's sentence but he disagreed, contending that he thought the forms were factual and the law enforcement officers and others were not victims. The

Eighth Circuit upheld the enhancement, stating that Hildebrandt had ignored the fact that he was prosecuted for statements made to the IRS claiming that these individuals had received substantial amounts of non-wage income when, in fact, they had not. The Eighth Circuit concluded that Hildebrandt's sending out the forms to the IRS had made the individuals victims, justifying the three-point enhancement. Judge Hendren concluded that Fischer's case was similar to the *Hildebrandt* case because the false income tax forms Fischer prepared on behalf of law enforcement personnel brought the IRS's attention to the individuals, causing their victimization.

Judge Hendren then announced the applicable guideline range, 46 to 57 months prison and a fine of $12,500 to $125,000, and asked for comments from the attorneys and Fischer about where the sentence should fall within the applicable range. Rose told the judge that his client was truly sorry for what he had done and asked for a sentence at the bottom of the guideline range and waiver of any fine due to the large amount of restitution. Fischer apologized for "inadvertently" hurting others he thought he was helping and pointed out he had spent his adult life "fighting for the system" and was an honest individual. He also explained that his business grew far less than other tax professionals' businesses during the relevant time period. (Sentencing T. at 45-47).

The court sentenced Fischer at the bottom of the prison guideline range, 46 months, and imposed a $5,000 fine and restitution in the amount of $538,699. The court advised Fischer that he had the right to appeal the sentence within 10 days of the judgment and commitment order and that if he could not pay the cost of an appeal he could apply to him to appeal without cost and to be appointed an appellate attorney. The court dismissed the remaining counts and continued Fischer on an unsecured bond, granting his request to self-report in a few weeks to get his affairs in order. Fischer took no appeal.

At the evidentiary hearing, Fischer testified that because Rose promised him he would receive 18 months in prison, the 46 months was a "total shock" because he was "fully expecting to get sentenced to a maximum of 18 months." (Hearing T. At 96). Fischer admitted being shown by his attorneys a sentencing guidelines chart whereby he would start off at a base offense level of 18 but said he was advised he would get three levels off and have a final adjusted base offense level of 15 or even 13.

Fischer continued that immediately after sentencing, he told Rose, "What the hell is this? Eighteen months is not what I ended up getting. Appeal it." When Rose responded, "I can't," Fischer told him, "You can appeal anything." (Hearing T. at 96). Rose did not discuss with him the prospects of winning or losing on appeal but, from his response, Fischer took it to mean there were no grounds to appeal or there was some technical or legal reason preventing an appeal. Rose then picked up his briefcase and walked out of the courtroom. Fischer called Rose's office and left three messages over the next two days but Rose did not return his calls. In any event, Fischer was "fully convinced" he had demanded an appeal. (Hearing T. At 97).

Fischer was adamant at the evidentiary hearing that he had a very good recollection of the conversation with Rose after sentencing. He explained he spent 25 years of his life as a law enforcement officer and "[y]ou learn to pay attention to what's said." (Hearing T. at 107-08). He denied that Rose advised him that an appeal would have no merit or told him to get in touch with him about an appeal. He admitted that he was out on bond during the time for filing a notice of appeal but did not go to Rose's office. Fisher added that he had an arrangement with Rose that the $30,000 fee included everything from the initial investigation to an appeal with the United States Supreme Court, if necessary.

Pamela Fischer testified she was "shocked" by the sentence. (Hearing T. At 77). Her husband was agitated and she thought he would pass out. She spoke to Rose and told him to fix it and file an appeal, because this was not what they had agreed to. Rose responded "[t]hat nothing like this had happened to him in 25 years of law, and he couldn't" fix it. (Hearing T. at 78). She did not ask him why but started crying and he did not say they would meet later to discuss it.

Mrs. Fischer related that during the initial meeting with Rose, they agreed on a fee of $30,000 to represent both her and her husband and Rose told her this would include any necessary appeal. She, therefore, expected Rose to file an appeal and never spoke to him again about an appeal or made an appointment to discuss an appeal.

Mrs. Fischer recalled a conversation with Woods on one occasion concerning an appeal. She called Rose's office because she had not received a copy of the judgment. Rose's secretary told her to drop by the office and get the document and, while there, she could also pick up the evidence returned from the IRS which was in the conference room. Mrs. Fischer dropped by and got the items seven to ten days later, which she identified the day as the Tuesday or Wednesday after the Bike and Blues Festival of 2004. (I have telephonically confirmed with the Fayetteville Chamber of Commerce that the festival occurred on September 29-October 2, 2004.) While at the office, she ran into Woods and asked him why Rose would not file an appeal. He responded, "I don't know, Pam." (Hearing T. at 80).

Damien Fischer testified that his mother discussed an appeal with Rose after sentencing, urging him "to get it moving on." Rose "just kind of threw up the hands a little bit" indicating he would do what he could. (Hearing T. at 93).

Rose testified that up to the trial setting, Fischer maintained his innocence and was uninterested in a plea agreement even when confronted by defense counsel with various bogus deductions in the returns of law enforcement officers. Rose believed a jury would find Fischer guilty. He also knew that an investigation was revealing other people who had their returns done by Fischer which could be considered relevant conduct in sentencing. Rose thought the plea offer with a loss amount cap would be very beneficial to Fischer and the longer they waited the worse it would be. Fischer continued to say he had done nothing wrong and was going to trial. On Friday before trial was to start on Monday, counsel went though the same "litany that we'd been talking to him for months, weeks before. And he decided to accept the plea bargain." (Hearing T. at 41).

Rose admitted he probably told Fischer that in his many years of practice he had never had a judge not go along with a plea agreement which would have made it sound like a good bet that it would not happen in this case; however, Fischer knew the judge could reject the agreement. Rose also admitted he was "pretty well upset" himself after the judge's decision in the matter but the alternative to the plea agreement was to go to trial on the 65 counts which would have been a "blood bath" (Hearing T. at 60). Also, Fischer would not have received the two-point reduction for acceptance of responsibility.

Rose continued that after sentencing Fischer "was very distraught, he was loud, he was upset, and I don't blame him one bit, because I was pretty much upset myself." (Hearing T. at 54).

When asked if Fischer ever requested him to appeal, Rose testified:

A. No, sir. Immediately after the sentencing hearing, I believe Mr. Fischer had gone from the counsel table back to the first row there, and he may have been – I know his wife Pam was there and I think his son was there, and I immediately went back to him and he said, "Can we appeal this?"

-8-

> And I said, "Yes, we can, but you know, I'm going to tell you right now, he's crossed his T's," talking about Judge Hendren and I've said this about him many times, "crossed his T's and dotted his I's and the law is there, his reasoning is there."
>
> And if you read the transcript of his remarks, you'll see it." I said, "However, this is not the time or place," because we were still in the courtroom and there was still a lot of people milling around, not a lot of people but some people milling around.
>
> And I told him, I said, "Look, give me a call." I might have said, "You know, we got ten days," which is what the Judge had said from the bench, "and I want to discuss this with you."
>
> And that was the only discussion we had about appeal or any post-conviction relief.

(Sentencing T. at 19-20).

Rose denied telling Fischer he would receive only 18 months in prison. Rose said the number 18 was mentioned early on as the hoped-for adjusted offense level. Rose explained that if the amount of loss stipulated to in the plea agreement had been adopted by the court, the base offense level would have been 18. With an enhancement of two points for Fischer being in the business of preparing taxes and a two-level reduction for acceptance of responsibility, the final adjusted offense level would have been 18 with a guideline imprisonment range of 27 to 33 months. He and Woods went over the guidelines range chart with Fischer and discussed where they thought he would fall within the range. The PSI report arrived at a greater imprisonment range based on the loss being calculated at greater than $400,000 and the three-level victim enhancement.

Rose indicated that he still believes the victim targeting enhancement should not have applied to Fischer's case. He admits, however, that Judge Hendren carefully considered the matter and "[j]ust because I disagree with it doesn't mean that it's an appealable point." (Hearing T. at 26). In

fact, "it was well evident to me right then that any appeal on the merits of this case would have been just a waste of time and futile." However, he "absolutely" would have discussed appeal with Fischer if contacted after the hearing. If Fischer "would have said, 'File an appeal,' I would have filed an appeal so fast it'd make your head swim." (Hearing T. at 51). Rose also made clear that, although his original fee did not cover an appeal per his usual policy, he would have pursued an appeal on behalf of Fischer at no additional fee because they were both disappointed after sentencing and he would have done it to help him.

Rose testified that Pam Fischer made an appointment with him for September 29, 2004, to discuss an appeal. Rose explained that even though it was after the 10-day period for filing a notice of appeal, he had never had a follow-up discussion with Fischer and felt that if his wife wanted to discuss appeal that would be fine. She never showed up, however. Rose denied telling movant's counsel that the appointment with Mrs. Fischer was within the 30-day period for filing a notice of appeal.

Woods testified that he left town after giving his argument at sentencing and was not present when the sentence was imposed. When he returned, Rose told him things had not gone well at sentencing. Rose also told him that when Fischer asked if he could appeal, Rose said, "he didn't think it would bear any fruit." (Hearing T. at 74). Woods recalled that Pam Fischer picked up her husband's file after the 10-day period for filing an appeal but did not mention an appeal. Woods said that the first time he knew Fischer was upset about an appeal was when he got a copy of the § 2255 motion. He added that if he had done an appeal for Fischer, he would have felt compelled to file an *Anders* brief because there were no nonfrivolous appeal issues.

-10-

Woods also confirmed without objection statements Rose made in a recent interview with movant's counsel Jack Schisler that vary from Rose's testimony, *i.e.*, that Fischer definitely wanted an appeal and that the interview set up by Pam Fischer for September 29, 2004, to discuss the appeal was within the 30-day period for filing a notice of appeal.

I took under advisement the government's hearsay objection to testimony by Rafael Marquez, who works for the Federal Public Defender's Office, as to statements made by Rose in the interview. Marquez's testimony was basically the same as that of Woods whose testimony I credit in making my findings. Accordingly, Marquez's testimony need not be considered.

*Plea*

Fischer claims that his plea was unknowing and involuntary because defense counsel promised an 18-month sentence and restitution in the amount of $400,000 and he was not advised he faced a possible enhancement under the victim targeting guideline. At the evidentiary hearing and in Fischer's post-hearing brief, this matter was not addressed to any extent and Fischer admits that denial of appeal is his primary claim. Nevertheless, the claim challenging the validity of the plea was not dismissed and I will address it.

A valid plea must be knowing, intelligent, and voluntary. *Brady v. U.S.*, 397 U.S. 742, 747 (1970), meaning it "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Hill v. Lockhart*, 474 U.S. 52, 55 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). When the plea is on advice of counsel, the petitioner must show that counsel's performance was deficient and that, but for counsel's errors, there is a reasonable probability he would not have pleaded guilty but would have insisted on going to trial. *Hill v. Lockhart*, at 59.

I find that Fischer's plea was knowing and voluntary. Here, the government's evidence against Fischer was very strong and his attorneys expected him to be convicted. Despite the evidence against him, Fischer maintained his innocence for many months but finally listened to his attorneys and entered the plea agreement shortly before trial.

Contrary to Fischer's testimony, I do not believe that his attorneys advised him he would likely be sentenced to 18 months. Fischer offered no believable sentencing options that would have resulted in such sentence. The more credible version, as testified to by Rose, is that the number 18 was mentioned as the optimal adjusted offense level under the guidelines with a resulting prison range of 27 to 33 months.

Moreover, Fischer's plea was not dependent on the accuracy of Rose's predictions as to the guideline offense level or his failure to anticipate the victim targeting enhancement. Fischer was made aware that the guidelines would control and that the judge would make the final decision with respect to sentencing. He was also advised of the maximum penalties that attached as required by Fed. R. Crim. P. 11. *See U.S. v. Hodge*, 259 F.3d 549, 554 (8th Cir. 2001) (district court need not identify particular guideline range when accepting plea as long as defendant aware of maximum potential sentence, application of guidelines, and discretion of court to sentence).

Fischer has not shown that if he had been accurately advised of the eventual guideline range, he would have withdrawn his plea and gone to trial on all 63 counts. *See U.S. v. Eilva*, 430 F.3d 1096, 1100 (8th Cir. 2005)(no showing of prejudice from counsel's failure to accurately predict sentencing outcome). "A defense counsel's erroneous estimate of a guidelines sentence does not render an otherwise voluntary plea involuntary." *U.S. v. Bond*, 135 F.3d 1247, 1248 (8th Cir. 1998)(citation omitted).

The record also shows that Fischer knowingly and voluntarily waived his right to appeal or collaterally attack his plea/conviction. The waiver was part of the plea agreement and Fischer acknowledged the waiver in open court before Judge Hendren and has not argued here that the waiver in itself is invalid. *See U.S. v. Aronja-Inda*, 422 F.3d 734, 737-38 (8th Cir. 2005).

*Appeal*

Fischer claims he directed Rose to file an appeal but he failed to do so. An attorney's failure to file an appeal after being directed by his client to do so constitutes ineffective assistance. *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (citing *Rodriguez v. United States*, 395 U.S. 327 (1960). On the other hand, a defendant who explicitly tells his attorney not to file an appeal may not later complain that the attorney performed deficiently by following the instructions. *Flores-Ortega*, at 477. In those cases "when the defendant has not clearly conveyed his wishes one way or the other," *id.*, "counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing. *Id.* at 480. The Supreme Court expects that "courts evaluating the reasonableness of counsel's performance using the inquiry we have described will find, in the vast majority of cases, that counsel had a duty to consult with the defendant about an appeal." *Id.* at 481. Defendant must also demonstrate that, but for counsel's deficient performance, he would have appealed. *Id.* at 484. If a defendant prevails on his claim of denial of appeal, the appropriate remedy is resentencing, allowing the petitioner an opportunity for a timely appeal. *See Holloway v. United States*, 960 F.2d 1348, 1356-57 (8th Cir. 1991).

Based on the matters presented, I find that immediately after sentencing, Fischer was very upset and disappointed with his sentence as was Rose. Fischer asked Rose about the prospects of appealing but did not direct Rose to file a notice of appeal. Rose told Fischer that an appeal would be fruitless because the judge had solid reasons for his decisions but that the courtroom was not the place to discuss the matter and they would discuss it later. Fischer made no response and thus did not definitively tell Rose he wanted to appeal or had decided not to appeal. Rose and Fischer thereafter made no efforts to set up a meeting to further discuss the matter of appeal during the 10-day appeal time.

In making these findings, I have rejected the testimony of the Fischers that they directed Rose to take an appeal immediately after sentencing. It makes more sense, as testified to by Rose, that Fischer asked whether he could appeal since he had waived some of his appeal rights in the plea agreement. Also, Rose's testimony was credible that he would have definitely filed a notice of appeal if specifically directed to do so. I also reject Fischer's testimony that he called Rose's office three times during the first two days after sentencing to discuss appeal but Rose would not call him back. Because Fischer was out on bond during this time, it is unlikely he would have let the matter go that easily if he were interested in pursuing appeal. Rather, he would have kept calling Rose or Woods, set up an appointment, or gone to the attorneys' offices.

I further find that after the 10-day appeal time, the Fischers did not mention an appeal to Rose or Woods or make an appointment to discuss appeal. Apparently, Rose said in an interview prior to the evidentiary hearing that Mrs. Fischer made an appointment to discuss appeal on September 29, 2004, and that this date was within the 30-day appeal time. I find, however, that Rose has a faulty memory or is misinformed on these matters. Mrs. Fischer would surely have testified to such

-14-

an important appointment but denies ever making any such appointment. Rather, she testified that she went to the office once in early October 2004 to pick up a copy of the judgment and some evidence and, while there, asked Woods why Rose would not appeal. I reject this testimony as self-serving. Woods, who appeared to provide truthful answers even to potentially damaging questions, denied that Mrs. Fischer mentioned an appeal to him while at the office.

Based on the above factual findings, I conclude that this case falls under *Flores-Ortega* because after sentencing there was no clear directive by Fischer one way or the other regarding an appeal. Applying that case, I do not find that a duty to consult arose on the ground that "a rational defendant would want to appeal." For the reasons given by Judge Hendren at sentencing, I agree with Rose and Woods that any appeal of this issue would have been unavailing. I do find, however, that Rose had a duty to consult with Fischer about an appeal because immediately after sentencing Fischer "sufficiently demonstrated to counsel an interest in an appeal." The short exchange in the courtroom did not suffice for the necessary consultation at which counsel would discuss the "advantages and disadvantages of taking an appeal and [make] a reasonable effort to discover his [client's] wishes." *Roe v. Flores-Ortega*, 528 U.S. at 487.

The final inquiry is whether Fischer has shown prejudice from Rose's failure to consult with him about an appeal, meaning that, "but for counsel's performance, he would have timely appealed." *Id.* at 484. In other words "had the defendant received reasonable advice from counsel about the appeal, he would have instructed his counsel to file an appeal." *Id.* at 486.

I conclude Fischer had not shown that after a consultation discussing the pros and cons of appeal, he would have appealed. When told by Rose immediately after sentencing that he would not prevail on any appeal, Fischer did not press the point and made no attempt to contact Rose about the

-15-

appeal within the next few days or any time after that. Also, when Mrs. Fischer picked up the judgment and documents, she did not inquire about appeal. It thus appears that after Rose advised Fischer after sentencing of the scanty prospects for success on appeal, Fischer at that time lost interest in appealing or his interest was at best half-hearted. Woods gave credible testimony that he first learned of any disgruntlement concerning appeal when he read Fischer's § 2255 motion. There is therefore no reason to believe that Fischer would have decided to appeal after consultation during which Rose would have more fully explained the lack of meritorious grounds for appeal.

CONCLUSION

Based on the above, I recommend that the instant § 2255 motion be denied and dismissed with prejudice. **The parties have ten days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger *de novo* review by the district court.**

DATED this 27th day of March 2006.

/s/Beverly Stites Jones
HON. BEVERLY STITES JONES
UNITED STATES MAGISTRATE JUDGE